IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES ex rel. SHARON LANG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04 C 3290 |
| | ) | |
| NORTHWESTERN UNIVERSITY and | ) | |
| NORTHWESTERN MEDICAL FACULTY | ) | |
| FOUNDATION, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

*Pro se* plaintiff Sharon Lang has sued Northwestern University and Northwestern Medical Faculty Foundation for unpaid overtime under the Fair Labor Standards Act (FLSA) and retaliatory discharge under the federal False Claims Act (FCA) and Illinois common law. The parties have filed cross motions for summary judgment. For the reasons outlined below, the Court denies plaintiff's motion and grants defendants' motions.

**Facts**

Northwestern University (NU) operates the Feinberg School of Medicine and the Northwestern Memorial Hospital. Northwestern Medical Faculty Foundation (NMFF) is an independent not-for-profit organization whose members are full-time faculty members at the Feinberg School of Medicine or attending physicians at Northwestern Memorial Hospital. NMFF 56.1 Stmt. ¶¶ 1-2.

1

Sharon Lang worked as a histologist in the Department of Urology at the Feinberg School of Medicine from November 13, 1989 until May 21, 1999. Lang's original supervisor was Dr. Chung Lee, a researcher in the Department of Urology, but by the time Lang was terminated, Dr. Lee had transferred daily supervisory responsibility to Julia Senisbar, a graduate student. Lang also reported to Maureen Hartweger, the administrator of the Department of Urology, regarding administrative matters, such as reporting her hours, requesting leaves, and requesting funding for supplies. The parties dispute whether Lang was an employee of NU or NMFF during this time. For the purposes of this motion, we assume that Lang worked for both NU and NMFF. NMFF 56.1 Stmt. ¶¶ 3-4, 9-11, 28; Lang Resp. to NMMF 56.1 Stmt. ¶ 3.

From 1998 to 1999, Lang was a member of NU's staff relations committee, which planned social events for NU staff. Lang claims that after a meeting on February 3, 1999, Janet Stevens, Associate Dean of Operations for the Feinberg School of Medicine and a member of the staff relations committee, told Lang that NMFF was "cooking the books" to obtain increased federal funding by creating one set of financial records that showed what NMMF billed its patients and another showing what it collected from insurers. Stevens allegedly stated that NMMF's Finance Committee submitted the inflated figures to the Federal Reserve to obtain a $600 million loan and a more favorable "gold bond rating"[1] for the construction of new buildings for NU and NMFF. Lang states that Stevens gave her three articles from *Crain's Chicago Business* regarding NMFF's debt and the new construction, but she concedes that the two articles she has submitted to the Court contain no mention of NU or NMFF improperly obtaining a loan or bond rating. In fact, Lang states that she does not know if NMFF has ever filed a claim with

---

[1] It is not clear what this means.

the federal government, whether it ever applied for a loan from the federal government, or whether it sought federal assistance in obtaining a favorable bond rating. Lang claims that on February 5, 1999, she reported Stevens's statements to the FBI and faxed the agency the articles Stevens had given her. NMFF 56.1 Stmt. ¶¶ 31-51; Pl. Resp. to NU 56.1 Stmt. ¶ 13.

In late February 1999, Lang spoke with Arthur Hill, one of her co-workers, about her concerns and her reports to the FBI. Lang claims that Marge Smagur, the administrative assistant to Maureen Hartweger, overheard the conversation and asked to examine the articles that Lang had faxed to the FBI. Lang states that after she gave Smagur the articles, Smagur took them into Hartweger's office, and Lang never saw them again. Lang concedes that because she was not in the room, she has no direct knowledge of what Smagur told Hartweger, but she argues that the evidence circumstantially permits an inference that Smagur told Hartweger about Lang's contact with the FBI and gave Hartweger the articles. Lang also contends that Hartweger also was made aware of her reports to the FBI through three letters she sent to Hartweger requesting the return of the articles she had lent to Smagur. Dr. Schaeffer, the head of the Department of Urology, Dr. Lee, and Hartweger have stated that they did not learn of Lang's contacts with the FBI until after Lang's termination. NMFF 56.1 Stmt. ¶¶ 52-74; Lang Supp. Ex. A.

On May 21, 1999, Dr. Lee informed Lang that NU had decided to eliminate her position because the grant that funded her position was ending. NU 56.1 Stmt. ¶ 45. NU and NMFF claim that Lang's salary always came from a grant from the National Institutes of Health for the study of Benign Prostatic Hypertrophy (BPH grant), but they concede that they used other funds to pay Lang when they were awaiting renewal of the grant and during the year after the BPH grant expired in 1998. NMFF 56.1 Stmt. ¶¶ 17-21. Lang states that she was paid by a variety of

3

sources throughout her employment and that she was the only employee whose termination was attributed to the end of the BPH grant. Lang Resp. to NMFF 56.1 Stmt. ¶¶ 17-28.

On May 26, 1999, Lang contacted Rita Winters of NU's Human Resources Office and advised Winters that NU owed her overtime pay and that her termination was due to her whistleblowing activities. On June 2, Winters requested that Lang submit evidence that she was entitled to overtime wages, namely the personal calendars in which Lang noted her overtime hours. Lang did so. On June 27, Lang inquired about the status of her overtime response. She received no response and did not follow up on her overtime pay claim. NU 56.1 Stmt. ¶¶ 47-50; Lang Ex. L; Lang Supp. Exs. B, L.

**Discussion**

A defendant is entitled to summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court draws all reasonable inferences in the light most favorable to the non-moving party even when the parties have filed cross motions for summary judgment. *Continental Cas. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). We begin by addressing the defendants' motions for summary judgment and reading the facts in the light most favorable to Lang.

**1. FLSA claim**

An employee must bring a claim for unpaid overtime within two years after the claim accrues or within three years if the employer withheld overtime wages willfully. 29 U.S.C. § 255(a). Even assuming that NU willfully violated FLSA, Lang's claim is barred by the statute of

limitations. She filed this lawsuit on May 10, 2004, four years after she was laid off from NU and one year after the limitations period expired. Lang claims that she detrimentally relied on NU's promises to investigate her claim and pay her overtime, but this does not excuse her failure to bring her suit within the limitations period. *See Flight Attendants Against UAL Offset v. Comm'r of Internal Revenue*, 165 F.3d 572 (7th Cir. 1999).

### 2. Retaliatory discharge under the FCA

Section 3730(h) of the FCA prohibits the discharge of an employee "because of lawful acts done by the employee or on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." 31 U.S.C. § 3730(h). To survive summary judgment, a plaintiff must provide some evidence showing "(a) [her] actions were taken in 'furtherance of' an FCA enforcement action and were therefore protected by statute; (b) [her] employer had knowledge that [she] was engaged in this protected conduct; and (c) [her] discharge was motivated, at least in part, by the protected conduct." *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004).

Lang's claim fails at the first step in the analysis, because a jury could not reasonably find that she called the FBI in furtherance of an action or a potential action under the FCA. An employee's actions are protected if "'1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *Id.* at 480 (quoting *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002). Assuming Lang believed that NU and NMFF defrauded the government, no reasonable jury could find that her belief was reasonable.

5

Lang concedes that she had no personal knowledge of NU or NMFF submitting claims, applying for loans, or requesting assistance in obtaining a favorable bond rating from the federal government. She nonetheless maintains that her suspicion of fraud was reasonable based on the statements of Janet Stephens, the articles from *Crain's Chicago Business*, and NU's previous federal NIH grant fraud. NMFF 56.1 Stmt. ¶¶ 31-51; Pl. Resp. at 5. This purported evidence, however, is not sufficient to raise a question of material fact as to whether Lang's was reasonable in believing that NU and NMFF were defrauding the federal government. *See Neal v. Honeywell, Inc.*, 33 F.3d 860, 864 (7th Cir. 1994) (noting that an employee who "imagines fraud but lacks proof" cannot prove her conduct was in furtherance of an action under the FCA).

Lang's claimed awareness of the alleged fraud was based on Stephens's statements, not her own experience or knowledge. Lang's claimed reliance on Stephens's alleged statement is insufficient to permit a jury to find that Lang had a reasonable belief NU or NMFF had defrauded the government. Lang has made no effort to show that Stephens's claimed statements reached even a minimal level of plausibility: she has offered no evidence indicating that the Federal Reserve makes loans to or rates the bonds of private entities, or that NU or NMFF sought, or had occasion to seek, federal assistance in connection with obtaining a loan or getting a favorable bond rating. The other "evidence" that Lang claims she had likewise is insufficient to allow a jury to find Lang's belief was reasonable. The articles from *Crain's* contain no indications of fraud, and the case cited by Lang involved researchers overstating the amount of time spent working on an NIH grant, not NU or NMFF concocting financial statements to obtain loans and favorable bond ratings. *See* NMFF 56.1 Stmt. ¶¶ 37-38; NMFF Ex. 10 (Meera Somasundaram, *Northwestern Faculty Docs Under the Knife: Fighting for Profitability; a*

*Numbing Debt Load,* Crain's Chi. Bus., Nov. 23, 1998, at 1); NMFF Ex. 11 (Meera Somasundaram, *Head of NU's Faculty Doctor Practice Retires: Exit Occurs as Foundation Faces Debt, Morale Woes,* Crain's Chi. Bus., Jan. 18, 1999, at 4); U.S Dept. of Justice, *Northwestern University Will Pay $5.5 Million to Resolve False Claims Act and Common Law Allegations* (Feb. 6, 2003), *available at* http://www.usdoj.gov/opa/pr/2003/February/03_civ_076.htm/. Because no reasonable jury could find that Lang *reasonably* believed that the defendants violated the FCA, Lang cannot show she called the FBI in furtherance of an action under the FCA. Her claim for retaliatory discharge under the FCA therefore fails.

### 3. Retaliatory discharge under Illinois common law

The tort of retaliatory discharge creates an exception to "the general rule that 'at-will' employment is terminable at any time for any or no cause." *Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 128, 421 N.E.2d 876, 878 (1981). To succeed in an action for retaliatory discharge, a plaintiff must prove "(1) that [she] has been discharged; (2) in retaliation for [her] activities; and (3) that the discharge violates a clear mandate of public policy." *Stebbings v. Univ. of Chi.*, 312 Ill. App. 3d 360, 365, 726 N.E.2d 1136, 1140 (2000).

Even assuming that Lang was discharged for calling the FBI, she has not provided evidence showing that her discharge violates clear public policy. To prove that her discharge violated a clear mandate of public policy in the present context, a plaintiff must prove first that she had a good faith belief that her employer's activities violated the law, and second that public policy favored reporting of the improper conduct. *See id.* at 370-71, 726 N.E.2d at 1144. In *Stebbings*, the Illinois Appellate Court held that the plaintiff had a good faith belief that his

7

employer, Argonne National Laboratory, violated federal regulations when it failed to report the test subjects' radon overexposure to the National Institutes of Health. First, the court held that even though the regulations did not technically apply to Argonne, "[a] reasonable person could interpret the regulations, as Stebbings allegedly did, as covering the research at Argonne." Second, the court held that Stebbings had a good faith belief that Argonne had violated the regulations, because the U.S. Department of Energy stopped all research on human subjects when it learned of the overexposure incident. *Id.* at 371-72, 726 N.E.2d at 1144-45. As discussed above, however, Lang, unlike Stebbings, had no knowledge about federal requirements regarding the defendants' bookkeeping, nor did she have any basis to believe that defendants had made loan applications to the government or had sought any sort of a bond rating from the government. No jury could reasonably find that Lang believed in good faith that NU and NMFF violated the law.

## Conclusion

For the reasons stated above, the Court grants the defendants' motions for summary judgment [docket nos. 63 & 74]. Because no reasonable jury could find in Lang's favor, the Court also denies her motion for summary judgment [docket no. 72]. The Clerk is directed to enter judgment in favor of the defendants.

                                                        /s/ Matthew F. Kennelly
                                                     MATTHEW F. KENNELLY
Date: January 20, 2006                               United States District Judge